[No. 31395. Department One. May 3, 1951.]

BETTY WHITMORE FRANCON, *Appellant*, v. GEORGANNA COX et al., *Respondents*.[1]

'Reported in 231 P. (2d) 265.

 

*Lycette, Diamond & Sylvester* (*Herman Howe,* of counsel), for appellant.

*Croson, Johnson & Wheelon,* for respondents.

DONWORTH, J.—Plaintiff, Betty Whitmore Francom (erroneously spelled Francon in the record), brought this action to recover from her stepmother an undivided one-half interest in certain described real and personal property and to obtain an accounting of her share of the income therefrom. The action was tried to the court sitting without a jury. At the close of all of the evidence the trial court, having denied a motion for a judgment notwithstanding the oral decision of the court, or, in the alternative, for a new trial, entered a decree dismissing the action. Plaintiff has appealed from this decree.

In this opinion Georganna Cox (formerly Georganna Whitmore) will be referred to as though she were the sole respondent.

Respondent and John Fenton Whitmore were married July 10, 1935. On November 14, 1943, Mr. Whitmore (herein referred to as the decedent) died, intestate, in Seattle, Washington. Respondent, decedent's widow, was appointed administratrix of the estate. The assets of the estate consisted of a five-room house located in Seattle, which was appraised at four thousand eight hundred dollars, and personal effects and household goods, appraised at eight hundred dollars. All property involved in this case was community property of decedent and respondent.

In respondent's petition for her appointment as administratrix, she alleged that she was the sole heir of decedent and, in her final report and petition for distribution, she stated:

"That the above named decedent, John Fenton Whitmore, left surviving him no issue entitled to share in his estate or any part thereof, and that he left surviving him as his only heir at law, Georganna Whitmore [Cox], his surviving wife, and that she is entitled to receive full and final distribution of all of the assets of said estate which was the community property of said decedent and his said surviving wife."

It is not denied that respondent gave proper notice to the creditors of the estate and later published notice of the time and place of the hearing on her final report and petition for distribution, in accordance with statutory requirements.

On August 24, 1944, a decree of distribution was entered and all property of the estate of John Fenton Whitmore was distributed to respondent as community property. During the administration of the estate of decedent, respondent did not ask for an award in lieu of homestead or a family allowance.

Decedent had been previously married to Isabell Kendall Whitmore in 1919. An interlocutory decree of divorce was granted the first Mrs. Whitmore in Utah on March 4, 1920, and the final decree of divorce was entered on November 29, 1920. Appellant, the only issue of decedent's first marriage, was born August 21, 1920, at Nephi, Utah.

Respondent testified that she was introduced to appellant by decedent in May, 1943, when they were in Salt Lake City visiting one of decedent's sisters. It was at that time that respondent first learned that decedent had been previously married. The record in this case shows, however, that appellant had written letters to decedent as early as 1941 and had received letters from him in which he referred to their relationship as that of father and daughter. Respondent testified that she knew nothing of this correspondence until the letters were shown to her in the offices of appellant's attorneys in 1948. As a result of this revelation, respondent was under a doctor's care for two years.

. Respondent testified as follows with respect to her one meeting with appellant:

"Q. And you were introduced to Betty Whitmore Francom at that time by your husband? A. Yes. He winked at me at the time. He looked at me and gave me a wink and introduced me. Q. And how did he introduce you to her? Did he say, 'This is my daughter Betty,' or something of that kind? A. I don't remember. Q. You don't remember? A. I don't remember just how, you know, just how it was done, but it was that it was his daughter, and then he winked at the time."

The testimony of appellant with reference to the same meeting was as follows:

"Q. And at the time that you were introduced to her [respondent], who was present? A. My aunt, Mrs. Edna Harris, Mr. Whitmore [decedent] and Mrs. Whitmore, and my baby. Q. There was nobody else there? A. No. Q. How did you happen to go there? A. Well, I was out and when I returned my mother told me that my father had called and that he wanted to see me, he was here in Salt Lake, and he left me a number to call, and so I called and he made an appointment for my aunt and my baby and me to come down, for whoever I—he said he wanted to see me and the baby, and so I went down. Q. How long did you and your father and your aunt and Mrs. Cox visit at that time? A. Oh, I'd say two and a half hours, maybe three altogether. Q. Were you introduced to Mrs. Whitmore as Mr. Whitmore's daughter? A. Well, I can't remember just exactly what he said, but that was the impression I got, that she knew that I was his daughter. Q. Was that discussed during the conversation? A. Well, he referred to my baby as 'my grandchild', and my aunt said, 'How does it seem to have a big daughter,' or something, to him. I don't know whether Mrs. Whitmore was in the room at the time, but I remember that's what my aunt said to him. Q. Was she in the room when he was talking about his grandchild? A. Yes."

Respondent telephoned decedent's one brother and four sisters in Salt Lake City informing them of his death within fifteen minutes after he died. Appellant, who was then living in Nephi, Utah, was informed of the death by one of her aunts, but was unable to attend the funeral in Seattle because her infant daughter was ill.

Appellant testified that she first learned of the probate of her father's estate in the fall of 1945, but that she did not

consult an attorney until shortly before the present suit was filed in 1948.

Respondent's reason for not including appellant as one of the heirs in the probate proceeding was stated in her direct examination as follows:

"Q. Mrs. Cox, you were appointed Administratrix of your husband's estate, that is your husband John Fenton Whitmore, after his death, is that correct? A. Yes, sir. Q. At that time you filed a petition for letters of administration and alleged that you were the only heir? A. That's right. Q. Did you at that time know that the plaintiff in this case claimed to be an heir of Mr. Whitmore? A. No. Q. Did you at that time believe the plaintiff to be a child of your former husband, Mr. Whitmore? A. No. Q. Did you ever communicate with her? A. No. Q. Did you ever write her a letter? A. No. Q. Did your husband ever tell you whether or not she was his child? A. He always said it was his wife's child, not his. Q. Did you believe that? A. Yes, because I was taught by my father that when a husband told me anything it was the truth."

It was for this reason, also, that she did not personally contact appellant and give her an opportunity to prove her relationship and right to share in the estate. It does not appear that respondent knew appellant's address but it is certain that she could have easily procured it by inquiry among decedent's relatives.

In considering the problems presented by this case, it is necessary to have in mind precisely what issues were presented by the pleadings.

The complaint, after alleging the death of Mr. Whitmore, leaving real and personal property in King county, and the administration of his estate by respondent who had knowledge of the fact that appellant was decedent's daughter and knew her address, stated:

"IX

"That the defendant, Georganna Cox, fraudulently and with intent to deceive the Court and in violation of her oath of office as administratrix of said estate, advised the Probate Court of King County for the State of Washington, that she, the said defendand and administratrix, was the sole heir of the deceased and that the deceased had no children, which

was not true and known to be untrue by the defendant at the time of making said statements under oath to the court; that the defendant prevented the plaintiff from having her right to her father's property submitted to, or considered and allowed by the Court.

"X

"That on August 24, 1944, as a result of the fraud perpetrated by the defendant on the plaintiff and on the court in concealing the fact of the death of her father from the plaintiff, and deliberately preventing the plaintiff from obtaining any notice of the probate of the estate, said defendant caused the Probate Court to distribute all of said property to herself, in an attempt to deprive the plaintiff of her property and to gain said property for the defendant; that said wrongful action of said defendant prevented the plaintiff from having an opportunity of advising the court of the true facts and the fraud perpetrated upon the court by the defendant."

Respondent's answer denied the essential allegations of the complaint except the allegations concerning the proceedings had in the administration of the estate and contained two affirmative defenses.

The first defense was *res judicata*. The proceedings in the probate court were described and it was asserted that the decree of distribution entered therein was a final and conclusive adjudication of the matter set forth in the complaint.

The second defense was estoppel. The failure of appellant to appear in the probate proceedings was alleged to have induced respondent to believe that she was decedent's sole heir and therefore respondent had claimed no allowance in lieu of homestead, no family allowance, no administratrix fee, and had paid certain creditors and expenses of administration out of her personal funds. For this reason, it was asserted that appellant was estopped to deny respondent's title to so much of the estate as respondent would have received if she had claimed all of her rights as surviving widow of decedent.

The material allegations of the two affirmative defenses were denied in appellant's reply.

The principal issue to be decided by this court is whether the conduct of respondent amounted to fraud sufficient to

warrant a court of equity granting relief to appellant. It should be noted that this is not a will contest nor an action to set aside a final decree of distribution, but is a suit to have respondent declared a trustee *ex malificio* as to one-half of the property involved.

The recent case of *Ellis v. Schwank,* 37 Wn. (2d) 286, 223 P. (2d) 448 (which arose upon a demurrer to the complaint), involved the question of whether the decedent's executor was guilty of such misconduct as to amount to extrinsic fraud. The complaint charged the executor with destroying two wills executed subsequently to that probated and also written acknowledgments by decedent that the plaintiff was his daughter, all with the intent to defraud plaintiff of her rights as decedent's daughter.

In deciding that the executor's conduct in that case constituted extrinsic fraud we said:

"The first question to be determined is whether the fraud charged is extrinsic or intrinsic, the reason being that some cases hold that if the fraud be intrinsic no recovery may be had. All cases hold that recovery may be had if the fraud be extrinsic.

"Extrinsic fraud is that fraud which denies or prevents a person his opportunity to present at the trial all of the rights or defenses he is entitled to present.

" 'It may be stated as a general rule that where the action of the successful party in probate proceedings, in concealing or failing to disclose to the court the existence of a person interested in the estate, amounts to fraud of any kind, and the defrauded person has thereby been prevented from learning of the proceeding or asserting his claim therein, the fraud is extrinsic, rather than intrinsic, and such person is entitled to equitable relief against the decree of the probate court.' 113 A. L. R. 1235.

"We are convinced that in this case the fraud alleged amounted to extrinsic fraud. The pleadings in this case set forth facts which demonstrated that respondent held the property belonging to appellant in trust for her use and benefit. This trust arose from the fraudulent acts of respondent and is termed a trust *ex maleficio* or a constructive trust."

See, also, *Farley v. Davis,* 10 Wn. (2d) 62, 116 P. (2d) 263, 155 A. L. R. 1302.

In the instant case, the trial court found in his oral decision that appellant was the child and heir of the decedent, but that respondent believed from representations made by decedent that appellant was not his daughter. It further found that appellant could have procured respondent's address from decedent's relatives. The trial court held, however, that no extrinsic fraud had been proven and that, following *Krohn v. Hirsch,* 81 Wash. 222, 142 Pac. 647, this action should be dismissed.

In holding that no extrinsic fraud was shown we believe the trial court erred. Respondent, as administratrix, took it upon herself to determine that appellant was not an heir of decedent when this was clearly a matter for the probate court to decide. Furthermore, although she could readily have ascertained appellant's address, respondent made no effort to inform appellant that decedent's estate was being probated other than through the statutory notice by publication.

Respondent contends, however, that the probate code of the state of Washington does not require that the administratrix shall give personal notice of proceedings to interested parties except in the event that the interested parties have served upon the administratrix or her attorney a written request stating a desire to receive notice of certain steps or proceedings in the administration of the estate. Rem. Supp. 1941, § 1434.

In describing the duties of an administrator and commenting on his right to appeal from a decree of distribution, this court in *In re Maher's Estate,* 195 Wash. 126, 79 P. (2d) 984, 117 A. L. R. 91, said:

"While it is the duty of an administrator to guard against error in the distribution of an estate, by exercising the greatest possible care to see that the names of the persons entitled under the law to receive the estate, either as heirs at law or legatees, are brought to the attention of the court, and that their names and respective interests are fully and correctly stated in the decree of distribution which is to be presented to the court for signature, when, after a full hearing, the court signs a decree of distribution, the interest of one acting as administrator of an estate terminates, and he,

as such administrator, is no longer interested in the proceeding, in so far as the distributees are concerned, and can appeal from the decree of distribution only in connection with his fees or allowances, some question concerning debts due from the estate, or some matter which concerns his own liability as administrator."

Respondent relies on *Krohn v. Hirsch,* 81 Wash. 222, 142 Pac. 647, as being controlling in the decision of this case. The trial court so considered it. In the cited case, the administratrix alleged in her petition for distribution that she was the sole heir of the decedent and thereupon a decree was entered distributing all property to her as community property. Over one year later, a suit was brought by appellant, an alleged sister of decedent, to have administratrix declared an involuntary trustee of such interest as was claimed by appellant in the property distributed to the administratrix upon the ground that the property was separate property of decedent and was procured by fraud on the part of administratrix. The evidence showed that appellant was a resident of South Dakota and that, during the course of administration, appellant had some correspondence with the administratrix in which she claimed to be a sister of decedent and in which the administratrix denied the relationship. Appellant was aware of the death of decedent but had no actual knowledge of the administration until some time after the final settlement of the estate. This court held that the decree of distribution was final and binding upon all the world. The court stated in this regard:

"To say that respondent now holds any part of this property in trust for Mattie Krohn is nothing more nor less than saying that the question of who was entitled to take the property left by James McCarthy was not correctly determined upon the merits by the superior court upon the distribution hearing, and that appellant Mattie Krohn should now be awarded a new trial upon that question more than one year after it has been solemnly adjudged against her and all the world, upon due notice. As between respondent and appellant Mattie Krohn, that was an adverse proceeding. To us, it is inconceivable that a party can be considered as holding in trust for his adversary property which has been awarded to him as against his adversary by a judgment

rendered upon due notice in a proceeding instituted and carried on for the very purpose of determining the claims of each as against the other, to the property involved, *in the absence of fraud, or some fact extrinsic of the merits of the controversy in issue,* such as would avoid such judgment. We are of the opinion that such is not the law, and *that there has not been any fraud shown to have been committed by respondent as against the rights of appellant Mattie Krohn, extrinsic of the merits of the questions involved* in and disposed of by the decree of distribution." (Italics ours.)

This court stated in its opinion that the administratrix in that case had acted in good faith in consistently denying the claim of appellant (Mattie Krohn) that she was a sister of the decedent. In fact, Mattie Krohn had been notified by the administratrix that her claim as a sister of the deceased would not be recognized. She knew that she would not be listed as an heir and, although she was not aware of the then pending probate proceeding, she took no action looking to the enforcement of her claim. Consequently, this court upheld the trial court in dismissing her subsequent suit. No extrinsic fraud was shown and in that material respect the *Krohn* case is distinguishable from the present one.

*In re Christianson's Estate,* 16 Wn. (2d) 48, 132 P. (2d) 368, also cited by respondent, is not in point for the reason that a reading of the opinion does not disclose that the personal representative of decedent, or anyone else, knew of the existence or place of residence of the heir omitted from the decree of distribution.

The case of *In re Baker's Estate,* 27 Wn. (2d) 933, 181 P. (2d) 826, to which respondent refers, involved only intrinsic fraud and has no bearing upon the present case. The same comment applies to *Davis v. Seavey,* 95 Wash. 57, 163 Pac. 35.

In the instant case, respondent was guilty of extrinsic fraud which prevented appellant from presenting her claim of heirship to the probate court. Respondent occupied the position of a trustee with respect to decedent's property. She knew that there were only two pos-

sible heirs interested in the estate of which she was administratrix, to wit, appellant and herself. Yet she undertook to decide that appellant was not decedent's daughter, without submitting that question to the probate court, and thereby obtained title to all of the property in the estate. Respondent occupied the dual role of administratrix and heir of decedent. While acting as such trustee, respondent prevented appellant's claim from being adjudicated and caused the court to declare that she (respondent) was the sole heir and beneficiary of the trust which she was then engaged in administering. This intentional misconduct of the administratrix prevented appellant from having a fair submission of the issue as to her heirship and comes within the definition of extrinsic fraud as stated in *Farley v. Davis*, 10 Wn. (2d) 62, 116 P. (2d) 263. Consequently, the decree of distribution is not *res judicata* and may be attacked by appellant in this suit.

Finally, respondent contends that, if the trial court's decree of dismissal be reversed, she should be given credit for what she would have received as a family allowance and as an award in lieu of homestead if she had petitioned for them during the probate of the estate. This contention is based on the supposition that, if appellant had made a claim to a portion of the estate during the pendency of the probate proceeding, respondent could have substantially reduced the amount of the estate available for distribution and that appellant cannot ask for equity without offering to do equity.

The right to award of property in lieu of homestead, and the right to family allowance from an estate, are purely statutory rights for which application must be made. Since no petition for award in lieu of homestead or for family allowance was filed, the issue as to whether such allowance could have been made is not before this court for determination.

The equitable doctrine of estoppel referred to by respondent in her second affirmative defense has no application to this case since her own fraudulent conduct pre-

cludes her receiving any equitable relief from the situation in which she has placed herself.

Our conclusion is that respondent holds an undivided one half interest in the real and personal property acquired from the estate of John Fenton Whitmore, deceased, as trustee for the benefit of appellant and that respondent shall account to appellant for one half of the rental value of the real property and the rents, issues and profits pertaining thereto from and after November 14, 1943.

The decree of the trial court is reversed with instructions to enter a decree granting appellant such relief as is consistent with this opinion.

SCHWELLENBACH, C. J., BEALS, and HILL, JJ., concur.

FINLEY, J. (dissenting in part)—The evidence in this case presents a very close question as to who did wrong. The crux of the matter seems to be whether respondent, the second wife of the deceased John Fenton Whitmore, knew that Betty Whitmore Francon, appellant, was the daughter of the deceased. Appellant's testimony does not appear to establish this fact too clearly. Respecting her one meeting with appellant, respondent testified that she was introduced to Betty Whitmore Francon by John Fenton Whitmore; that when he introduced Betty Whitmore Francon as his daughter, he winked at respondent. Respondent further testified that she did not remember specifically just what was said at the time of the introduction, but that appellant was introduced as John Fenton Whitmore's daughter, and that the winking occurred in connection with the introduction. Appellant's testimony was that she did not remember just exactly what her father had said at the time of the introduction, but that he had made it obvious that she was his daughter, and that in further conversation he had referred to appellant's child as "my grandchild."

The majority opinion concludes—largely from the foregoing resumé of testimony—that during the time she was administratrix of the estate of John Fenton Whitmore, deceased, respondent knew that appellant was the daughter

of the deceased. Based upon this conclusion, the majority hold respondent blameworthy to a degree constituting extrinsic fraud.

The fact is not emphasized too greatly by the majority, but it appears that within fifteen minutes after the death of decedent, respondent notified a brother and four sisters of decedent in Salt Lake City, by telephone. This could be characterized as one thing to respondent's credit. Appellant apparently learned of her father's death through her uncle and aunts and as a direct result of respondent's telephone call. Appellant was unable to attend the funeral in Seattle. She seems to have learned of the estate proceedings in the fall of 1945, but did nothing about the matter until she consulted an attorney in 1948, and the present suit quickly developed. It could be said that appellant was not exactly "on her toes," so to speak, with respect to her rights, and that some blameworthiness might possibly be inferred from her lack of diligence.

Reminiscent of the struggle between Lord Coke and the Chancellor, it could be said that this proceeding sounds in equity. It is my view that both of the contending parties were more or less at fault. I cannot agree that respondent was so greatly at fault that she should be penalized to the extent indicated by the majority opinion. Technically, it may be said that the majority opinion does not set aside or revise the final decree of the probate court. Realistically, the majority opinion is a revision of the final decree of the probate court. Bluntly stated, that decree—or at least the end result thereof—partially is set aside. The property or proceeds of the estate in the hands of respondent are impressed with a trust for the use and benefit of appellant to a degree or extent that the court is willing to recognize the belated heirship claims of appellant. It is safe to say that is a recognition of appellant's interests or claims and is in conflict with the final decree of the probate court, although not one word is deleted, and no interlineation is inserted physically in the final probate decree by amendment or further order of the court.

Respondent has advanced estoppel as an affirmative defense, mentioning appellant's lack of diligence, and pinpointing respondent's right to claim family allowance and homestead interests in the estate.

On the assumption that this is a proceeding in equity, it would appear more equitable to me to recognize appellant's rights or interests in the estate of her deceased father which were precluded by the blameworthiness of respondent; and at the same time to recognize the rights or interests of the respondent to which she would have been entitled if appellant had been a party to the probate proceedings. In other words, it would seem to me that it would be more equitable for this court to give recognition on this appeal to the rights and interests of not just one side or the other—but to both contending parties as the same existed when the estate was probated. Technically, that result could be reached by recognizing the claims and rights of appellant not inconsistent with those of respondent at the time the estate was probated. The theory of a constructive trust need not necessarily be applied in a manner to deny the family allowance and homestead interests of respondent.

The majority takes the position that family allowance and homestead interests are created by statute and that respondent has not followed the statute to confer legal recognition on her claims to family allowance and homestead interests. The theory is intriguing, but not irrevocably convincing. In fact, the majority's theory on this point could be applied adversely with respect to appellant. Certainly, appellant's rights as an heir are statutory. She has not followed the statutory procedure to confer recognition upon those rights or to prevent foreclosure of those rights through the operation of the statute of limitations or the statute of repose feature of the probate legislation of this state.

If it is objectionable for technical procedural reasons to give positive recognition directly to respondent's claims to family allowance and homestead, the same result could be accomplished merely by limiting the degree or extent of the recognition given to appellant's claims, remembering

the interests and claims of respondent in the matter, and keeping in mind that we are functioning along equitable principles in attempting to provide relief to appellant. Pursuant to the majority opinion, the trial court, through a further hearing, appointment of a commissioner, or upon stipulation of the parties, must ascertain facts as to the rental value of the real estate in order that appellant's specific interest therein may be determined. In the same manner, the trial court could discover and determine whether the respondent's claims or interests in family allowance and homestead are valid, the extent or degree, or monetary equivalent or value of the same, as of the time of the probate proceedings. The constructive trust could be tailored accordingly.

As mentioned heretofore, the affirmative defense of estoppel in respondent's answer to appellant's complaint seems to me to have raised the issue of family allowance and homestead. The principle is well recognized that equity will do that which should be done. We find extrinsic fraud attributable to respondent, and apply the equitable doctrine of constructive trusteeship for the use and benefit of appellant. This is to correct an injustice which we believe has been done to her. I cannot agree that in correcting one injustice through application of principles of equity, we should foster what appears to me to be a harsh and unjust result respecting respondent, particularly when a more just result appears properly possible through what, to me, seems to be merely a closer adherence to basic principles of equity and simple, straightforward justice.

In view of the foregoing, I concur in the result of the majority opinion recognizing in effect appellant's heirship claims; but it is my conviction that recognition also should be given to respondent's claims or interests respecting family allowance and homestead, as suggested herein. I disagree with the majority views on the latter point.