[No. 33307. Department One. December 8, 1955.]

MARY JOSEPHINE WEST, *Respondent,* v. A. B. STANFIELD *et al., Appellants.*[1]

[1]Reported in 290 P. (2d) 704.

*Guttormsen, Scholfield, Willits & Ager*, for appellants.

*Kelley, O'Sullivan & Myers*, for respondent.

DONWORTH, J.—This is an action by an adopted daughter against her foster sister and brother-in-law, and the marital community composed thereof, seeking a half interest in the estate of their deceased mother (all of which was distributed to the sister) upon the ground that the decree of distribution so awarding the property was procured by extrinsic fraud.

Myrtle Lane, a divorced woman, then a resident of Alaska, died intestate in Anchorage on August 15, 1948. She was survived by her natural daughter, Patricia Stanfield, of Seattle, and an adopted daughter, Mary Josephine West. Neither Patricia nor her mother had had any knowledge of

the whereabouts of the adopted daughter during approximately the last twelve years of the mother's life.

Upon the information supplied by Patricia, her husband, A. B. Stanfield, filled out the death certificate of Myrtle Lane and listed Patricia Stanfield as the sole surviving child. Upon his petitions, defendant husband was first appointed special administrator and then administrator of the estate of Myrtle Lane. In each of these petitions, it was alleged that Patricia Stanfield was the only child and sole heir of deceased. On completion of the administration, the administrator, on July 18, 1950, filed his final account, and on November 21, 1950, the probate court in Anchorage entered its order settling the final account of the administrator and distributing the entire estate to Patricia Stanfield as the daughter and sole heir of deceased.

The present action was commenced February 5, 1953, alleging in two causes of action that defendants conspired with each other to defraud plaintiff and the Alaska probate court, by concealing plaintiff's existence from the probate court, and that that court, thus deceived as to the true facts, distributed the entire estate of Myrtle Lane to Patricia Stanfield. The prayer sought, generally, a judgment in the amount of one half of the appraised value of the estate so distributed. The answer was a general denial.

Trial was had before the court sitting without a jury. At the conclusion thereof, the court summarized the issue in this action thus:

"This question [case] can be decided by the answer to one question. That question is: Did A. B. Stanfield and Patricia M. Stanfield, his wife, during the time that the estate was being probated in Alaska, have knowledge of the existence of the plaintiff, Mary Josephine West; have knowledge that she was an adopted child of Myrtle Lilje Lane; or knowledge of facts sufficient to put them on inquiry as to the continued existence of Mary Josephine West, and inquiry as to the adoption? If they did, then they are guilty of extrinsic fraud, in the opinion of the court, by not calling these facts to the attention of the court, and there would be a resulting *trust ex maleficio*, entitling plaintiff to the relief for which she has prayed. In the opinion of the court they did have such knowledge."

Findings of fact and conclusions of law were made and entered, and, pursuant thereto, judgment was entered substantially in accordance with the prayer. From this judgment, defendants appeal and assign error to certain findings of fact and conclusions of law (assignments Nos. 2 to 9, inclusive), to the overruling of their challenge to the sufficiency of the evidence at the close of plaintiff's case (No. 1), to the denial of their motion in the alternative for judgment notwithstanding the oral decision or for a new trial (No. 10), and to the entry of judgment against Patricia Stanfield, A. B. Stanfield, and the marital community composed thereof (Nos. 11, 12, and 13).

The family background of the parties to this action can be briefly stated. In 1922, the deceased contracted marriage with Joseph Lilje, in Newport, Washington. Patricia Stanfield, her daughter by a former marriage, was then four years old. The family shortly thereafter moved to St. Maries, Idaho, and lived on a farm, where, when Patricia was seven years old, her mother and stepfather, on August 5, 1926, legally adopted respondent as their daughter. At that time, respondent, who was nicknamed Peggy, was about five years old.

Mrs. Johnson, who as a young lady of twenty-two had been employed by the Liljes as housekeeper prior to, and at the time of, the adoption, testified in considerable detail as to their life on the farm. She lived in the same house with both of the children near St. Maries for two years and testified that Patricia was displeased with the adoption of respondent and had frequently referred to her as being only an adopted sister. The trial court expressed its confidence in her testimony, saying, in its oral opinion:

"Compared to her testimony with respect to recognizing or not recognizing Peggy Lilje, the testimony of the former servant, Mrs. Walter Johnson, was like a fresh breeze in the case. She remembered dozens of little details, all having the ring of truth and coming with a candor and frankness that leads the court to attach full credibility to the testimony of Mrs. Johnson. She was able to recognize Peggy Lilje at first sight. She was able to recall scores of illumin-

ating little details of their life together on the farm near St. Maries, Idaho, that made the court feel that here was a true picture from a disinterested witness and testimony entitled to complete credibility."

It is significant to note that, after Mrs. Johnson had testified fully regarding Patricia's home life in St. Maries between the ages of seven and nine when she and respondent and the witness were living in the same house for two years, Patricia was recalled to the stand in rebuttal. In answer to the first question asked by her counsel, she testified:

"Q. Mrs. Stanfield, we will begin with the life on the farm. Do you have any recollection or remembrance of Mrs. Walter Johnson at the time you lived on the farm? A. No. I certainly do not."

After living near St. Maries for approximately five years, the family moved to Arizona, where, in 1931, the adoptive parents were divorced, and respondent was placed in an orphanage by her adoptive father, while Patricia continued to live with her mother. Patricia and her mother visited respondent occasionally while she was at the orphanage. Her adoptive mother later took respondent from the orphanage after she had lived there about four years, and Patricia, who was then married, saw her numerous times at various places in Arizona while respondent was living with her adoptive mother.

After respondent had lived with her adoptive mother for several months, she secured employment in Phoenix, where she could both work and attend school. This was about 1935. Respondent testified that she never saw the deceased again after they ceased to live together. They corresponded for several months, until finally the deceased failed to answer respondent's letters. This, presumably, was at the time that the deceased moved to Alaska in 1936. Patricia believes there was a sixteen-year interval during which she had no contact whatsoever with respondent.

Another incident which should be mentioned because it fixes a date when appellants were given notice of respondent's existence and of her right to inherit from her adoptive

father, is the death of Patricia's uncle, Charles Broadwell, which took place in Spokane on October 19, 1950. Shortly before this, Mrs. Broadwell had written Patricia that respondent was being sought as an heir of her former step-father's estate.

Patricia went to Spokane to attend her uncle's funeral on October 21, 1950, and returned to Seattle on the same plane with Mrs. Broadwell. At that time, the aunt discussed with Patricia the necessity of locating respondent in order that the Lilje estate might be closed. Appellant, A. B. Stanfield, met the plane in Seattle and drove his wife and her aunt to their respective destinations.

The events just mentioned occurred just one month before the closing of the administration of Patricia's mother's estate in Anchorage, Alaska.

Respondent was eventually found by the investigators for the Lilje estate, after she had written to the orphanage in Arizona in an attempt to locate her adoptive parents. She had been living at Langley on Whidby Island since about January 1, 1940. Through these investigators, respondent learned of the whereabouts of Patricia, and she immediately went to visit Patricia at her home in Seattle in September or October, 1951. A. B. Stanfield was present on this occasion. Respondent was accompanied on this visit by a Mrs. Patterson—one of her natural sisters.

As to what occurred at this meeting, the evidence is in direct conflict. According to respondent's version, one purpose of the visit was to ask Patricia's assistance in identifying her as being the adopted child of Joseph and Myrtle Lilje. She was met at the door by Patricia with a hug and a kiss and an exclamation, "Oh Peggy, I would know you any place." Patricia introduced respondent to her husband as "Peggy, my sister." During the course of their visit that evening, Patricia spoke of Myrtle Lane as "our mother." As various instances and events of their childhood were recalled during this visit, Patricia frequently turned to her husband and said, "Remember, Honey, I told you about it?" and he would respond, "Yes." Patricia repeated to respond-

ent and her companion that she was not pleased with the adoption of respondent at the time of that event. She elaborated on her displeasure by saying that she had wanted her mother and stepfather to adopt an older child so that she would have a playmate more nearly her own age.

Respondent was told by Patricia that her mother had died in Alaska, but was not told that she left an estate or that Patricia had received any property by inheritance. At the time of this visit, the decree of distribution in the Alaska probate had been entered some ten or eleven months, but the time for taking an appeal from this decree had not yet expired.

Appellants' version of this meeting was wholly at variance with respondent's testimony. In their testimony, appellants denied that Patricia ever had knowledge of the adoption and denied that she had ever communicated to her husband the fact of such an adoption. They also denied the account given by respondent and her companion of the events and conversation transpiring at the visit to their home by respondent and her sister.

In weighing the evidence and commenting upon the credibility of appellants' witnesses, the court, in its oral decision, indicated several instances wherein it believed that Patricia Stanfield in particular had testified falsely. Appellants insist that, if Patricia Stanfield's testimony was false in any respect, it was false with regard only to a matter not material to the issue in this case. From this, it is argued that the court used an improper basis in its determination of the credibility of that witness, and also in choosing to believe respondent's witnesses and not to believe appellants' witnesses.

Even if we admit *arguendo* that the matter referred to was not material to the issue in this case, the trial court's evaluation of Patricia Stanfield's credibility is not impeached. Her testimony with regard to other matters which were material supports the court's position. The trial court, having appellant wife and the other witnesses before it, had an opportunity to observe the demeanor and conduct of the

various witnesses while they were on the stand. It was, therefore, in a better position than this court to evaluate the veracity of each witness, and its determination as to Patricia's credibility will not be disturbed unless it is shown to be without foundation.

This case turns solely upon an issue of fact. The evidence was in irreconcilable conflict as to whether appellants had knowledge of respondent's adoption and of her being alive at times material to this case. The trial court was compelled to decide that issue by weighing the evidence in the light of the credibility of the various witnesses. The court's conclusion, as expressed in its oral decision, was that Patricia and her husband had knowledge of the adoption and continued existence of respondent (or at least such knowledge or notice as to put them on inquiry) sufficient to make it their duty to bring these matters to the attention of the Alaska court.

Appellants criticize this oral opinion in several respects, but the scope of our review is confined to a determination of whether the evidence preponderates against the findings of fact made by the trial court. Having determined that respondent proved the material allegations of her complaint by evidence which the trial court found to be clear, cogent, and convincing, respondent is entitled to the benefit of all evidence and the reasonable inferences therefrom in support of the findings of fact entered. *In re Dand's Estate*, 41 Wn. (2d) 158, 247 P. (2d) 1016. After an examination of the entire record, we cannot say that the evidence preponderates against the findings complained of in any material respect, and, therefore, we must accept them as verities. *McDonald v. Wockner*, 44 Wn. (2d) 261, 267 P. (2d) 97, and cases cited. In our opinion, assignments of error Nos. 1 to 7, inclusive, and No. 10 are without merit.

Error is assigned (No. 8) to conclusion of law No. 3, which reads:

"That the fraud and concealment of the defendants and each of them, as set forth in the foregoing Final Findings of Fact, constitute extrinsic fraud, justifying action by this

Court in depriving defendants and each of them of the proceeds of their fraudulent action."

In support of this assignment of error, appellants argue that their conduct, as found by the trial court, did not amount to extrinsic fraud. They attempt to distinguish this case from *Ellis v. Schwank*, 37 Wn. (2d) 286, 223 P. (2d) 448, and *Francon v. Cox*, 38 Wn. (2d) 530, 231 P. (2d) 265.

The last mentioned case is sufficiently similar to the present case to be controlling. It is true that in the *Francon* case Mrs. Cox, the administratrix and the "sole" heir, were one and the same person, while here appellant husband was the administrator, and appellant wife was the "sole" heir. But both appellants, acting in concert, intentionally and fraudulently concealed from the probate court the fact that respondent was an adopted daughter of the deceased, and thereby prevented respondent from presenting her claim of heirship to the probate court. In other words, appellants together did precisely what Mrs. Cox did alone in the *Francon* case, and with the same result. Appellants' conduct constituted extrinsic fraud. See, also, *Farley v. Davis*, 10 Wn. (2d) 62, 116 P. (2d) 263, 155 A. L. R. 1302, and *Batey v. Batey*, 35 Wn. (2d) 791, 215 P. (2d) 694, for a discussion of what constitutes extrinsic fraud. Assignment of error No. 8 is without merit.

Appellants make the further contention that mere concealment of an heir does not warrant the court in imposing a trust *ex maleficio*, but we think that the case of *Francon v. Cox, supra,* is a sufficient answer to that contention.

In assignment of error No. 9, appellants complain of a conclusion of law which holds that respondent is entitled (a) to a decree declaring that each of the appellants, and the marital community composed thereof, hold certain property in trust for respondent, and (b) to a money judgment against each of the appellants, and the marital community composed thereof, in favor of respondent in an amount equal to one half of the value of the property distributed to Patricia Stanfield. Assignments Nos. 11, 12, and 13 complain

of the entry of such a decree and judgment against appellants, individually, and their marital community.

The court found that each appellant had participated in the fraud practiced upon respondent and the probate court, and in the benefits resulting therefrom. The court also found that the funds received from the estate were commingled by appellants with their community funds and used to pay community debts or to purchase community property. The decree imposed a trust upon the items of property which were admitted to have been purchased in the community name with the funds derived from the estate. The money judgment is to be diminished by the amount, if any, realized by respondent from the property held in trust.

No cases are cited to call our attention to any error in the judgment so entered. Since both appellants participated in committing the fraud, and the community admittedly received the benefit of their wrongful conduct, we can see no error in the conclusion of law, nor in the decree and judgment entered. *McHenry v. Short*, 29 Wn. (2d) 263, 186 P. (2d) 900.

Appellants attempt to justify their conduct by saying that they did not know that a married man could not adopt a child without his wife's also adopting the child. Even assuming that they knew nothing about the laws relating to adoption, this lack of legal knowledge would be no defense. No doubt the attorney for the mother's estate could have properly advised them as to this matter, but there is no evidence that either appellant ever consulted him regarding the rights of an adopted child.

In their brief, appellants state:

"The facts also show that the deceased never mentioned the Respondent to her friends, her lawyer or her banker and clearly did not intend for Respondent to share in her estate."

The right of an adopted child to inherit from an adoptive parent cannot be lost by the parent's intention to disinherit the child, unless expressed in a properly executed will, nor can it be lost by the child's failure to communicate with the parent for a substantial period of time.

Having been adopted by Joseph Lilje and his then wife (the deceased Myrtle Lane) in 1931, respondent still had her right of inheritance in 1948, when Myrtle Lane died intestate. Since appellants intentionally and fraudulently conspired to withhold from the probate court knowledge of respondent's adoptive status and her right of inheritance under the circumstances shown by the evidence in this case, the decree and judgment of the trial court must be, and hereby is, affirmed.

ROSELLINI, SCHWELLENBACH, FINLEY, and OTT, JJ., concur.

